UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOSEPH HARDESTY,                               Case No. 1:16-cv-367

       Plaintiff,                               Judge Timothy S. Black

vs.

THE KROGER CO., *et al.*,

       Defendants.

## ORDER GRANTING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT (Doc. 32)

     This case is before the Court on the motion of Defendants The Kroger Co. and

Kroger G.O. LLC (collectively, "Kroger") for summary judgment (Doc. 32) and the

parties' responsive memoranda (Docs. 44, 64).

## I.      INTRODUCTION

### A. Background.

     Mr. Hardesty is a 50 year old Caucasian male.  (Doc. 14 at ¶ 9).  Mr. Hardesty

began working for Kroger as a recruiter at its Center of Recruiting Excellence ("CoRE")

in Blue Ash, Ohio, on February 23, 2015.  (*Id.*)  CoRE recruiters like Mr. Hardesty

communicate with applicants to various Kroger affiliated stores, including by telephone.

(Doc. 14 at ¶ 12).  As Kroger employees, CoRE recruiters are required to uphold the

company's values of honesty, integrity, respect, diversity, safety, and inclusion.  (Doc. 32

at ¶ 1).[1]  CoRE recruiters also must comply with Kroger's "Customer First Promise" by

---

[1] Mr. Hardesty admits these values are included in Kroger's employee handbook but denies these
values are a sufficient basis for termination.  (Doc. 60 at ¶ 1).

holding customers in "the highest regard" and providing them with exceptional service. (*Id.* at ¶ 2).[2]

Mr. Hardesty worked on the CoRE Center's Mass Hire Team. (Doc. 14 at ¶ 14; Doc. 15 at ¶ 14). Daniele Williams, an African-American female, was the manager of the Mass Hire Team throughout Mr. Hardesty's employment. (Doc. 32 at ¶ 9; Doc. 60 at ¶ 9). Three weeks prior to his termination, which is the subject of this lawsuit, Mr. Hardesty had a performance review with Ms. Williams. According to Mr. Hardesty, Ms. Williams told him that he was "doing fine" and that she was "impressed" that a store requested him to assist with a hiring campaign. (Doc. 32 at ¶ 11; Doc. 60 at ¶ 11). Mr. Hardesty claims he did not receive any negative feedback during the review from Ms. Williams or anyone else in Kroger management. (Doc. 32 at ¶ 13).

Prior to the circumstances leading to his termination, Mr. Hardesty only had one negative incident with Ms. Williams. Specifically, Mr. Hardesty commented to Ms. Williams that he "didn't really like helping [another team]." (Doc. 25 at 40:9-25). This comment upset Ms. Williams, who responded "Well, you are going to do [it]. Get used to it." (*Id.* at 40:16-41:6).

**B. Facts giving rise to Mr. Hardesty's claims.**

On September 10, 2015, Briana Whitlow—one of Mr. Hardesty's coworkers— reported to Ms. Williams that she had just witnessed Mr. Hardesty deliberately "release"

---

[2] Mr. Hardesty admits that Kroger has a policy entitled "Customer 1st business strategy" but denies that it explicitly requires recruiters to hold customers in the highest regard or provide exceptional service, and denies it applies to his conduct in this case. (Doc. 60 at ¶ 2).

(disconnect) an incoming call. (Doc. 32 at ¶ 21; Doc. 29 at 108:15-109:7; Doc. 30 at 230:8-232:4).[3] Ms. Williams asked Ms. Whitlow to write up exactly what she witnessed. (Doc. 32 at ¶ 22; Doc. 29 at 109:16-18).[4] On that same day, Ms. Whitlow sent Ms. Williams an email that stated:

> As I was speaking with Carly about scheduling a candidate, I noticed [Mr. Hardesty] was releasing calls (hanging up on candidates) that were coming through to his phone while he was in mid conversation with Aretha [O'Aku]. I just wanted to inform you. This was roughly between 3:15pm and 3:30pm today. Thanks!

(Doc. 32 at ¶ 23, Doc. 45-11).

Ms. Williams investigated Ms. Whitlow's allegation. Ms. Williams reached out to Chris Weiler, a third-party project manager, to ask if he could pull telephone call statistics for an individual recruiter. (Doc. 32 at ¶ 26; Doc. 60 at ¶ 26).

The following day, Mr. Weiler provided Ms. Williams with average call times for recruiters on the Mass Hire Team for September 10, 2015 (the day of the alleged offense), as well as the two weeks preceding that date. (Doc. 32 at ¶ 28; Doc. 60 at ¶ 28; Docs. 57-13, 57-14).

After reviewing the data from Mr. Weiler, Ms. Williams concluded that Mr. Hardesty's average call times were "considerably shorter" than other recruiters. (Doc. 30 at 243-245). During the week that included the date of the incident Ms. Whitlow

---

[3] Mr. Hardesty denies this paragraph for lack of knowledge (Doc. 60 at ¶ 21), but does not cite to any evidence to rebut the testimony of Ms. Williams and Ms. Whitlow that, on September 10, 2015, Ms. Whitlow reported to Ms. Williams that she witnessed Mr. Hardesty release an incoming call.

[4] Mr. Hardesty denies this paragraph for lack of knowledge (Doc. 60 at ¶ 22), but does not cite to any evidence to rebut the testimony of Ms. Whitlow.

reported (September 3, 2015 to September 10, 2015), Mr. Hardesty's average call time was 1 minute, 46 seconds. (Doc. 57-14 at 2). During that week, Mr. Hardesty's average call time was the lowest on his team. (*Id.*) The next lowest was four minutes, one second; the team average was five minutes, twenty two seconds. (*Id.*)

Although the available data could not speak to whether Mr. Hardesty hung up on a particular call, Ms. Williams interpreted the discrepancy between Mr. Hardesty's average call times, and the team's average call times, to indicate that there was some "dishonest actions that occurred" that may substantiate Ms. Whitlow's claim that Mr. Hardesty had intentionally released an inbound phone call. (Doc. 30 at 255:16-21).

On September 11, 2015, Ms. Williams contacted Human Resources Manager Diana Victoriano to discuss Ms. Whitlow's report and the status of Ms. Williams's investigation. (Doc. 32 at ¶ 31; Doc. 60 at ¶ 31). Ms. Williams's email stated, in relevant part:

> I was informed by one of my recruiters on Thursday that another recruiter was hanging up on applicants calling in. I was told this happened at least 3 times. In looking at the data, there are definite outliers with this recruiter where the average talk time for the mass hire team is 5 minutes. The recruiter in question has an average talk time of 1 min and 46 seconds. The data has been consistent for the last 2 weeks. In pulling data that reflects the entire CoRE team, again his avg talk time for the last 2 weeks was a min less than the next shortest time.

> There is no tolerance for our recruiters to hang up on customers. I do have a statement from the person that witnessed this action and reported it to me. In talking with Rana, we would like to get your insight on addressing this issue but I believe a termination should occur.

(Doc. 57-12 at 2).

Ms. Victoriano responded, in relevant part:

> I agree that the recruiter needs to be separated. I would schedule time to
> meet with him. If he admits it, you could terminate or offer the option to
> resign. If he does not, I would separate him based on his actions and
> dishonesty.

(*Id.*) Ms. Victoriano explained that she viewed releasing calls as an "immediately

terminable offense" because "it goes against [Kroger's] values. It won't help your

reputation with potential customers, shopping customers, our candidates." (Doc. 28 at

114:19-115:2).

Ms. Williams spoke with Ms. O'Aku, whom Ms. Whitlow reported was speaking

with Mr. Hardesty at the time of the alleged offense. (Doc. 30 at 238:15-17). Ms. O'Aku

told Ms. Williams that she had not noticed Mr. Hardesty discontinue a call during their

conversation. (*Id.* at 239:2-5).

As part of her investigation, Ms. Williams spoke with Mr. Hardesty and asked if

he was having any telephone issues. (Doc. 25 at 70:6-71:4). Mr. Hardesty describes the

conversation as:

> I went in, sat down, and she asked me if I was having any phone issues with
> my phone. And I told her no. And she said well, we were looking at some
> metrics. And she said the reason I ask is your call times seem to be
> substantially shorter than the rest of the mass hire team. Can you explain
> that for me?
>
> And I said, well, I said, one thing, I talk pretty quick. I go through phone
> screens pretty quick. I said there have been some situations where I've
> dropped calls, which has been brought to your attention before. And I
> believe that's about all I said.
>
> And she said, well, I'm just having trouble understanding, again, why
> you're so much shorter. And I said, well, again I just—I talk fast. And she
> said, well, I want to make sure you're doing a good job with screening

applicants. You're actually doing the screening questions. And I said would you like me to go through a sample with you right now. She said no. And she said, okay. Well, that's all I wanted. Thank you very much. Have a good weekend.

(*Id.*)

Ms. Williams testified that, after her conversation with Mr. Hardesty, "a couple of things . . . kind of supported my decision to say something is off here, something is not right." (Doc. 30 at 256:5-12). She concluded that the only reasons capable of accounting for Mr. Hardesty's below-average call times were if he is "not identifying the best fit candidates, truly screening candidates and scheduling interviews" or if "he is disconnecting calls." (*Id.* at 257:19-22).

As part of her investigation, Ms. Williams spoke with Rana Schiff, the CoRE Operations Manager, on several occasions. (Doc. 32-2 at ¶ 3). Ms. Williams asked Ms. Schiff "if there was anything that she could think of that I am missing that I would need to look into." (Doc. 30 at 249:12-21). Ms. Schiff asked Ms. Williams if she had reached out to human resources, and Ms. Williams responded that she had. (*Id.*).

Prior to deciding to terminate Mr. Hardesty, Ms. Williams considered Ms. Whitlow's statement, Mr. Weiler's call data, and her consultations with Ms. Schiff and Ms. Victoriano. (Doc. 30 at 263:11-264:3). On September 14, 2015, Ms. Williams met with Mr. Hardesty and told him that he was being terminated for releasing phone calls. (Doc. 32 at ¶ 41; Doc. 60 at ¶ 41; Doc. 25 at 71:10-16). Mr. Hardesty later sent Ms. Williams a text message saying he wanted to speak with CoRE Director Buck Moffett about his situation. (Doc. 32 at ¶ 42; Doc. 60 at ¶ 42).

Mr. Moffett—a Caucasian male over 40 years old—was on vacation at the time of Mr. Hardesty's termination and was not part of the decision. (Doc. 32 at ¶ 43; Doc. 60 at ¶ 43). Mr. Moffett spoke with Mr. Hardesty when he returned from vacation. (Doc. 32 at ¶ 44; Doc. 60 at ¶ 44). During the conversation, Mr. Hardesty denied engaging in any wrongdoing. (Doc. 32 at ¶ 45; Doc. 60 at ¶ 45). Mr. Moffett said he would look into the situation. (Doc. 25 at 76:21-15; Doc. 27 at 165:23-166:15).

Mr. Moffett then met with Ms. Schiff and Ms. Williams to discuss Mr. Hardesty's termination. (Doc. 27 at 166:24-167:11). The three "discussed what [Mr. Hardesty's] side of the story was and what he had shared with" Mr. Moffett. (Doc. 27 at 167:7-11). Mr. Moffett asked Ms. Schiff and Ms. Williams how Mr. Hardesty's side of the story "aligned with what they had seen and how they viewed the situation." (*Id.*) This conversation allowed Mr. Moffett to "really understand the sequence of events that led up to [Mr. Hardesty's] termination and how the decision was made[.]" (Doc. 27 at 168:9-14).

After speaking with Ms. Schiff and Ms. Williams, and reviewing Mr. Hardesty's phone records and Ms. Whitlow's statement, Mr. Moffett told Mr. Hardesty he was "going to let his termination stand." (Doc. 27 at 180:13-16).

After reviewing Ms. Whitlow's statement, call data records, and speaking with Ms. Williams about her investigation, Ms. Schiff agreed that Mr. Hardesty's employment at Kroger should be terminated. (Doc. 32-2 at ¶ 3).

Ms. Williams believes that Mr. Hardesty hung up on an inbound call. (Doc. 70 at 273:15-16).

### C. Mr. Hardesty's Complaint.

On March 9, 2016, Mr. Hardesty commenced this lawsuit. The Amended Complaint ("Complaint") (Doc. 14) alleges that Kroger discriminated against Mr. Hardesty because of his age, sex, and race. The Complaint asserts claims for age discrimination under the Age Discrimination in Employment Act ("ADEA") and Ohio law, reverse sex discrimination under Title VII and Ohio law, and reverse race discrimination under Title VII and Ohio law.

## II.    STANDARD

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

# III.    ANALYSIS

## A.  Mr. Hardesty's reverse discrimination claims fail.

Counts Three, Four, Five and Six of the Complaint assert reverse discrimination claims under federal and state law.  Specifically, Counts Three and Four claim that Kroger terminated Mr. Hardesty's employment because he is a male; Counts Five and Six claim that Kroger terminated Mr. Hardesty's employment because he is Caucasian. Because these four claims are premised on the same argument—that Mr. Hardesty, a Caucasian male, was discriminated against as a member of the majority class—and because each claim is analyzed under the same *McDonnell Douglas* burden-shifting framework, the Court considers them together.

In order to establish a claim for "reverse" race or sex discrimination under Title VII, a plaintiff must first establish a *prima facie* case by showing: (1) background circumstances that support the suspicion that the defendant is the unusual employer that discriminates against the majority; (2) that the plaintiff was qualified for the position; (3) that the plaintiff was subjected to an adverse employment action by the defendant; and (4) that the plaintiff was replaced by a person outside of the majority class or that the defendant treated similarly situated persons outside of the majority class differently. *Nelson v. Ball Corp.*, 656 Fed. App'x 131, 134 (6th Cir. 2016) (race); *Simpson v. Vanderbilt Univ.*, 359 Fed. App'x 562, 568 (6th Cir. 2009) (sex). [5]

---

[5] Mr. Hardesty's state law claims are analyzed under this same framework.  *See Allen v. Ohio Dep't of Job & Family Servs.*, 697 F. Supp. 2d 854, 880 (S.D. Ohio 2010) ("in analyzing employment discrimination and retaliation claims brought under Ohio Revised Code Chapter 4112, the Court utilizes the same analytical framework applied to claims under Title VII").

If a plaintiff makes such a showing, the burden shifts to the defendant, who must "offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Nelson*, 656 Fed. App'x at 134; *Simpson*, 359 Fed. App'x at 568. A successful showing on the part of the defendant then shifts the burden back to the plaintiff to prove that the defendant's proffered reason was merely a pretext for discrimination. *Nelson*, 656 Fed. App'x at 134; *Simpson*, 359 Fed. App'x at 568.

### 1. *Mr. Hardesty has established a prima facie case of reverse discrimination.*

Kroger does not dispute the second and third elements of the *prima facie* case, *i.e.*, that Mr. Hardesty was qualified for his position and experienced an adverse employment action. Kroger argues that Mr. Hardesty cannot demonstrate the first or fourth elements. Specifically, Kroger argues that Mr. Hardesty cannot show background circumstances that suggest Kroger discriminates against the majority or that he was replaced by a person outside the majority class. (Doc. 32 at 10-11).

### a. Background circumstances.

The "background circumstances" requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing racial tension in the workplace. *Johnson v. Metro. Gov't of Nashville & Davidson County*, 502 Fed. App'x 523, 536 (6th Cir. 2012). The background circumstances element does not require the plaintiff to prove unlawful discrimination, only that it

support the **suspicion** that the defendant is the unusual employer who discriminates against the majority. *Id.*

Mr. Hardesty argues he meets this element because, *inter alia*, Ms. Williams, the person responsible for the decision to terminate his employment, is a minority (specifically, an African-American female). (Doc. 44 at 29).

The Court agrees with Mr. Hardesty. According to the Sixth Circuit, the fact that the decision-maker is a member of the minority class is sufficient to meet the "background circumstances" prong, and courts in this Circuit have found this prong to be satisfied in similar instances. *See Zambetti v. Cuyahoga Comm. College*, 314 F.3d 249, 257 (6th Cir. 2002) (finding the "background circumstances" element satisfied in reverse discrimination case where African-American decision-maker did not hire Caucasian job applicant); *Grace v. Univ. of Cincinnati*, Case No. 1:10-cv-315, 2011 U.S. Dist. LEXIS 148221, at ** 12-13 (S.D. Ohio Aug. 19, 2011) ("Plaintiff, however, easily satisfies the "background circumstances" requirement for reverse discrimination cases established by the Sixth Circuit, because . . . the decision-maker, is female"). Here, the fact that Ms. Williams, an African-American female, made the decision to terminate Mr. Hardesty's employment is sufficient to meet the "background circumstances" element of Mr. Hardesty's *prima facie* case of reverse race and sex discrimination. *Id.*

        b. <u>Replacement</u>.

Mr. Hardesty argues that he was replaced by a member outside of the majority class. Specifically, Mr. Hardesty argues Kroger hired three non-Caucasian women—

Luvenia Orso, Patrice McCullough, and Talia Robbins—within three months after Ms. Williams terminated Mr. Hardesty.  (Doc. 44 at 30-31).

Kroger argues that these hires were already "in transition" before Mr. Hardesty was hired and they did not replace his headcount.  (Doc. 32 at 11).

Notwithstanding this argument, Kroger stated in its answers to Mr. Hardesty's interrogatories that it hired three non-Caucasian women in the three months after it terminated Mr. Hardesty's employment.  (Doc. 47-1 at 2).  Courtney Strosnider, the supervisor on the Mass Hire Team, could not remember who took over the stores that were assigned to Mr. Hardesty.  (*See* Doc. 49 at 197:23—199:11).

Given the facts in the record, Mr. Hardesty has, at a minimum, created an issue of fact as to whether he was replaced by a member outside the majority class.

### 2.  *Kroger has a legitimate, non-discriminatory reason.*

As Mr. Hardesty has established a *prima facie* case of reverse discrimination, the burden shifts to Kroger to articulate a legitimate, non-discriminatory reason for its decision to terminate his employment.  *Nelson*, 656 Fed. App'x at 134; *Simpson*, 359 Fed. App'x at 568.

Here, Kroger informed Mr. Hardesty that it terminated his employment because he released an inbound call.  (Doc. 25 at 71:10-16).  The Court finds this reason to be legitimate and non-discriminatory.

### 3. *Mr. Hardesty has not created an issue of fact as to pretext.*

In response, the burden shifts back to Mr. Hardesty to establish that Kroger's stated reason is pretext for reverse discrimination. To establish pretext, a plaintiff must show that an employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was insufficient to explain the challenged conduct. *Simpson*, 359 Fed. App'x at 569 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Regardless of which option is chosen, the plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendants intentionally discriminated against him." *Id.* (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)).

Here, Mr. Hardesty argues that Kroger's stated reason is pretext for discrimination because (1) it has no basis in fact and (2) it is insufficient to warrant his termination.

#### a. <u>No basis in fact</u>.

Mr. Hardesty argues that Kroger's reason is pretext for discrimination because, he insists, he did not release an inbound call. (Doc. 44 at 34-35). Mr. Hardesty argues that he has consistently maintained he never released an inbound call, Ms. O'Aku—who was speaking to Mr. Hardesty at the time of the alleged incident—conveyed to Ms. Williams that she did not see Mr. Hardesty release an inbound call, the call data Kroger reviewed prior to his termination does not definitively show that Mr. Hardesty released a call, only that he had shorter call times compared to other recruiters, and Kroger's "badge-swipe" data suggests that Ms. Whitlow was not in the building at the time she alleges to have

witnessed Mr. Hardesty release the call. (*Id.*).[6]

In response, Kroger argues that, even if Mr. Hardesty did not actually release an inbound call, its decision to terminate his employment is not unlawful under the "honest belief rule" because Kroger "honestly believed" Plaintiff committed the infraction. (Doc. 32 at 12). The Court agrees.

The Sixth Circuit has explained that "[i]f an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (*i.e.* the adverse action) then the employee will not be able to establish pretext." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530-31 (6th Cir. 2012) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)); *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009). The basis of this honest belief must come from particularized facts that were before the employer when the decision was made, allowing the employer to make a "reasonably informed and considered decision before taking the adverse employment action." *See Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir.

---

[6] Mr. Hardesty repeatedly argues that Ms. Whitlow could not have seen him release a call on September 10, 2015 between 3:15 and 3:30 p.m., because she was scheduled to take a lunch break at 3:00 p.m. and Kroger's data shows that she used her badge to swipe into the CoRE facility at 3:41 p.m. (*See* Doc. 44 at 16). This argument is not well taken. First, Ms. Whitlow testified that she did not take a lunch break at 3:00 p.m. on September 10, 2015, and there is no affirmative evidence to rebut this sworn testimony. (Doc. 64-1 at ¶ 3). Second, Ms. Whitlow testified that she "never left the [CoRE] building on September 10, 2015 from the time I witnessed Mr. Hardesty hang up on at least one incoming call to the time I reported the incident to Daniele Williams" and again, there is no affirmative evidence to the contrary. (*Id.* at ¶ 4). Third, Ms. Whitlow testified that a "swipe" into the facility does not mean she left the building; she frequently cut across the lobby to get from one side of the floor to the other and had to swipe her badge to get back in. (*Id.* at ¶ 5). And finally, as explained *infra*, the law does not require Kroger to conduct a perfect investigation, and it is not required to conduct a detailed "badge swipe analysis" in order to retrace the footsteps of every employee who provides an eye-witness report that another employee broke the rules.

2001) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

The Sixth Circuit has explained that an employer need not demonstrate that its decisional process is optimal or that it left no stone unturned. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (citation omitted). The key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Id.* If there is no material dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual. *Braithwaite*, 258 F.3d at 494.

Here, the evidence is undisputed that Ms. Whitlow conveyed to Ms. Williams that she observed Mr. Hardesty release an inbound call. (Doc. 32 at ¶ 21; Doc. 29 at 108:15-109:7; Doc. 30 at 230:8-232:4). Ms. Williams spoke to Ms. Whitlow and asked her to prepare a written statement. (Doc. 32 at ¶ 22; Doc. 29 at 109:16-18). Ms. Williams investigated the allegation, which included analyzing call data and speaking with Mr. Hardesty and Ms. O'Aku. (Doc. 25 at 70:6-71:4; Doc. 30 at 238:15-239:5). Ms. Williams consulted with Ms. Victoriano, the Human Resources Manager, and Ms. Schiff, the CoRE Operations Manager, both of whom agreed with her decision to terminate. (Doc. 57-12 at 2; Doc. 32-2 at ¶ 3). Finally, Ms. Williams testified that she honestly believes Mr. Hardesty released an inbound call. (Doc. 30 at 273:15-17). In these circumstances, Kroger has demonstrated that the decision to terminate Mr. Hardesty's

employment was reasonably informed, considered, and based on an honest belief that Mr. Hardesty committed the infraction of which he was accused.

Mr. Hardesty argues that Ms. Williams's investigation was insufficient for a number of reasons. Specifically, Mr. Hardesty argues that Ms. Williams did not disclose her conversation with Ms. O'Aku to anyone else, declined an offer from Mr. Hardesty to demonstrate how he works through a phone screen, mischaracterized Ms. Whitlow's statement in her email to Ms. Victoriano, misinterpreted the call data she reviewed, failed to credit Mr. Hardesty's denial of the accusation, and failed to consider the fact that Ms. Whitlow was scheduled to be at lunch at the time she alleged Mr. Hardesty released a call. (Doc. 44 at 37-38).

Mr. Hardesty's arguments are not availing. First, Mr. Hardesty's arguments merely criticize which evidence Ms. Williams did and did not consider and the weight she assigned to the evidence that she did. The law does not require Kroger to conduct a perfect investigation, and the fact that Kroger did not consider, or credit, every piece of evidence that Mr. Hardesty argues supports his position is insufficient to show pretext. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) ("we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision"); *Younger v. Ingersoll-Rand Co.*, Case No. 1:10-cv-849, 2013 U.S. Dist. LEXIS 141292, at ** 55-56 (S.D. Ohio Sept. 30, 2013) ("[employer's] failure to interview the witnesses identified by [plaintiff] is not sufficient to demonstrate pretext"); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 287 (6th Cir. 2012) ("That [Plaintiff] or

the court might have come to a different conclusion if they had conducted the investigation is immaterial").

Second, in order to show pretext, a plaintiff must "allege more than a dispute over the facts upon which his discharge was based," he must "put forth <u>evidence</u> which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *See Braithwaite*, 258 F.3d at 494 (emphasis supplied). <u>Disputing facts is not enough</u>. *Block v. Meharry Med. College*, No. 17-5484, 2018 U.S. App. LEXIS 1392, at * 14 (6th Cir. 2018).

Here, Kroger has set forth evidence that Ms. Williams made the decision to terminate after speaking with every person who could have personal knowledge of the incident (Ms. Whitlow, Ms. O'Aku, and Mr. Hardesty), after obtaining and reviewing call data, and after discussing the situation with Ms. Schiff and Ms. Victoriano. Mr. Hardesty has not pointed to any <u>evidence</u> demonstrating that Kroger or Ms. Williams did not <u>honestly believe the reason for his termination</u>.

    b.  <u>Insufficient to terminate</u>.

Mr. Hardesty next argues that Kroger's stated reason for terminating his employment is pretext for discrimination because the conduct for which he was accused is insufficient to warrant termination. (Doc. 44 at 38). This argument is not availing.

A plaintiff attempting to establish that a defendant's proffered reason was insufficient to actually motivate his termination must show by a preponderance of the evidence that "other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which

the employer contends motivated its discharge." *Sharp v. Waste Mgmt.*, 47 F. Supp. 3d 584, 605 (S.D. Ohio 2014).

Here, Mr. Hardesty has not identified any employees outside of the majority class who engaged in "substantially identical conduct" but were not terminated. In fact, Mr. Hardesty was not aware of anyone else who was ever accused of intentionally hanging up on recruits. (Doc. 25 at 97:7-11).

Mr. Hardesty's arguments to the contrary lack merit. First, Mr. Hardesty argues that the offense he was accused of committing does not violate Kroger's Customer First Policy, which is one of the reasons Kroger cited in support of its decision to terminate. (Doc. 44 at 39; Doc. 47-5 at 1-2). Mr. Hardesty argues the Customer First Policy only applies to interactions with <u>customers</u>, not <u>job applicants</u>. (*Id.*) This argument fails. Both Ms. Williams, the person who made the decision to terminate, and Ms. Victoriano, the Human Resource manager, testified that the Customer First Policy applied to Mr. Hardesty's alleged infraction. (Doc. 30 at 229:15-25; Doc. 28 at 82:24-83:2). As Ms. Victoriano explained: "applicants are customers of CoRE" and "Kroger is so large that applicants could also be shopping customers." (Doc. 28 at 82:24-83:2). Mr. Hardesty, who bears the burden to demonstrate pretext, has not put forth any evidence to indicate otherwise.

Second, Mr. Hardesty argues that Kroger did not properly utilize progressive discipline as contemplated by its Discipline Action policy, which states, in relevant part:

> Generally, routine problems with an office associate are discussed and corrected on a day to day basis.  However, if a problem continues over a period of time, disciplinary action will be taken.  Initial action will consist of a discussion between the Manager and the associate.  Probation may be recommended.  If the problem persists, a written reprimand will be made.  Further problems can result in suspension or discharge.

 (Doc. 47-6 at 61).

This argument is not availing.  Initially, the plain language of the Discipline Action policy states that the policy applies "generally" to "routine" problems with an office associate.  (Doc. 47-6 at 61).  Mr. Hardesty, who bears the burden of showing pretext, has not pointed to any affirmative evidence indicating that it applies to the particular offense of which he was accused.

To the contrary, the undisputed sworn evidence in the record is that the Discipline Action policy does not apply.  Mr. Moffett and Ms. Schiff both testified that the Discipline Action policy did not apply to Mr. Hardesty's termination because releasing calls was not a "routine" problem.  (Doc. 27 at 197:23-198:20; Doc. 51 at 111:16-22). Ms. Victoriano considered releasing calls to be an "immediately terminable" offense. (Doc. 28 at 114:19-115:2).  Similarly, Ms. Williams also testified that she did not perceive other disciplinary actions, such as a written warning or a performance improvement plan, to be appropriate because releasing calls was a "deliberate act that cannot be coached."  (Doc. 31 at 283:22-285:10).

Additionally, there is no evidence that Kroger applied the Discipline Action policy inconsistently.  Specifically, there is no evidence that another employee who engaged in similar conduct was subject to a lesser degree of disciplinary action.  Absent this

evidence, Mr. Hardesty cannot demonstrate that Kroger's decision to terminate his employment is pretext for unlawful discrimination. *See Sharp*, 47 F. Supp. 3d at 605 (refusing to find pretext because "Plaintiff . . . fails to show that Defendant[] did not uniformly apply its policies").

**B.    Mr. Hardesty's age discrimination claims fail.**

Counts One and Two of the Complaint assert claims for age discrimination under federal and state law. Claims for age discrimination under the ADEA and Ohio law utilize the same *McDonnell Douglas* burden-shifting analysis used to analyze Title VII claims. *See Spencer v. Nat'l City Bank*, 732 F. Supp. 2d 778, 790 (S.D. Ohio 2010). Accordingly, the Court will consider both age discrimination claims together. *Id.* ("Because the ADEA and Ohio age discrimination actions require the same analysis, the Court will analyze these claims together under the ADEA's framework") (quotation omitted).

Specifically, once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse action. *Spencer*, 732 F. Supp. 2d at 791. If the employer meets this burden, the burden shifts back to the plaintiff to show that the employer's explanation was pretext for intentional age discrimination. *Id.* In an age discrimination case, the burden of persuasion remains on the plaintiff at all times to demonstrate that "age was the 'but-for' cause of their employer's adverse action." *Id.* at 790-91.

For the reasons explained in Sections III(A)(1)-(2), *supra*, the Court finds that Mr. Hardesty has set forth a *prima facie* case of age discrimination and Kroger has set forth a

legitimate, non-discriminatory reason for the adverse employment action. [7] Accordingly, the Court turns to the issue of pretext.

Mr. Hardesty argues that Kroger's legitimate, nondiscriminatory reason is pretext for age discrimination because (1) the reason is factually false, (2) the honest belief defense does not apply, and (3) Mr. Hardesty's alleged conduct—releasing calls—is insufficient to warrant termination. These arguments fail for the reasons asserted in Section III(A)(3), *supra*.

In support of his age discrimination claims, Mr. Hardesty advances the additional argument that Kroger's reason must be pretext for discrimination because younger employees on his team received more favorable treatment. Specifically, Mr. Hardesty argues:

> It is also worth noting that throughout Plaintiff's employment and beyond, the mass hire team was dominated by younger individuals who received favorable treatment. Throughout Plaintiff's employment, approximately 3 out of every 4 individuals on the team was under 40. The day after Plaintiff's termination, 86% of the team was under age 40. Further, individuals who received promotions on the team were all younger, including: Courtney Strosnider (promoted to supervisor), Marcelle Venter (promoted to supervisor), Luvenia Orso (promoted to recruiter), Briana Whitlow (promoted to trainer position). Simply put, evidence indicates that individuals under 40 dominated the team, and received more favorable treatment, thus providing evidence of discrimination on the basis of age.

(Doc. 44 at 42).

These arguments are not availing. Initially, Mr. Hardesty's argument that younger

---

[7] As explained in Section III(A)(1), there is a question of fact as to whether any of the three women Kroger hired in the three months after Mr. Hardesty was terminated "replaced" Mr. Hardesty. For purposes of the age discrimination claims, the Court notes that all three women were younger than Mr. Hardesty. (Doc. 47-1 at 3).

employees received "more favorable treatment" is conclusory and insufficient to raise an issue of fact as to pretext. *See Mohanna v. Jake Sweeney Auto.*, Case No. 1:10-cv-776, 2012 U.S. Dist. LEXIS 97413, at ** 38-39 (S.D. Ohio July 13, 2012) (plaintiff cannot create an issue of fact as to whether defendant-employer's stated reason is pretext for discrimination "by conclusory statements and subjective beliefs") (citation omitted).

Further, Mr. Hardesty's attempt to rely on statistics fails because he provides no evidence of the qualifications or backgrounds of the individuals who <u>applied</u> for positions or promotions on the Mass Hire Team. The Sixth Circuit Court of Appeals has expressly held that a plaintiff cannot create an issue of fact as to age discrimination without that information:

> Third, [Plaintiff] pointed out that 94.2% of the employees hired in the two years following his discharge were below the age of 40. Again, this figure does not indicate discrimination based on age. Not only does [Plaintiff] fail to provide us with the relative qualifications of those hired and the positions to which they were assigned, he neglects vital information regarding the pool of applicants and whether, for example, qualified older employees were available or applied for those jobs.

*Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987).

Here, Mr. Hardesty's conclusory argument that Kroger hired and promoted employees under 40 lacks the probative value required to create an issue of fact as to pretext because it does include any evidence of the applicant pool for those hires and/or promotions. *Id.* ("The probative weight of hiring figures . . . necessarily depends on the figures to which they are compared"); *see also Grant v. Harcourt Brace & Co.*, 12 F. Supp. 2d 748, 758 (S.D. Ohio 1998) (plaintiff's argument that 88% of people hired by employer were under age 40 was insufficient to create an issue of fact as to pretext

because "Plaintiff produced no evidence that younger applicants made up less than 88% of the applicant pool, or that [Defendant] hired younger applicants at a disproportionate rate than older applicants. Furthermore, Plaintiff has failed to produce *any* evidence whatsoever regarding the available applicant pool from which [Defendant] hired").

Mr. Hardesty has not cited to any affirmative evidence from which a jury could reasonably reject Kroger's explanation for terminating his employment, and, accordingly, has not created an issue of fact as to whether that reason is pretext for unlawful age discrimination.

## IV.    CONCLUSION

Accordingly, the motion of Defendants The Kroger Co. and Kroger G.O. LLC for summary judgment (Doc. 32) is **GRANTED**. The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** on the docket of this Court.

**IT IS SO ORDERED**.

Date:  3/21/18

Timothy S. Black
United States District Judge